Filed 8/25/15  P. v. Warren CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOHNATHAN HOWARD WARREN,<br><br>    Defendant and Appellant. | F068291<br><br>(Super. Ct. No. MCR044135)<br><br>**OPINION** |

THE COURT*

APPEAL from a judgment of the Superior Court of Madera County.  Ernest J. LiCalsi, Judge.

Tonja R. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Stephen G. Herndon, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*        Before Detjen, Acting P.J., Franson, J. and Smith, J.

A jury convicted Johnathan Howard Warren of involuntary manslaughter, assault by means of force likely to cause great bodily injury, and battery resulting in serious bodily injury. The jury also found true the allegation that the victim, Paul Carranza, was comatose before he died. The charges arose out of an incident wherein Warren confronted Carranza over a $10 debt. Warren approached Carranza from behind and tapped him on the shoulder. When Carranza turned around, Warren hit Carranza in the face with a single blow. An intoxicated Carranza fell backwards, striking his head on the pavement. The fall resulted in a traumatic brain injury that led to Carranza's death. The charges and jury verdict reflected the absence of evidence that Warren intended to murder Carranza.

Warren argues on appeal that the trial court erroneously failed to exclude evidence of his prior conviction for misdemeanor criminal threats. While we do not find any error, we affirm the judgment because, even if there was error, Warren cannot establish prejudice.

**FACTUAL AND PROCEDURAL SUMMARY**

The information charged Warren with (1) involuntary manslaughter (Pen. Code § 192, subd. (b)),[1] (2) assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)), and (3) battery resulting in serious bodily injury (§ 243, subd. (d)). Count II included an enhancement alleging Carranza was comatose as a result of the assault within the meaning of section 12022.7, subdivision (b).

The following testimony is limited to the day of the incident that led to Carranza's death and is presented in rough chronological order.

---

[1]All further statutory references are to the Penal Code unless otherwise stated.

Theodore Hernandez had been in the local park for most of the afternoon.  Also present was Warren, whom Hernandez had known for over a year.  Warren and Hernandez got into a fistfight over something inconsequential.  Hernandez got the worst of the fight, ending up with a black eye.  Hernandez and Warren continued to drink beer together after the fight.

Carranza and Hernandez's girlfriend, Jolene Hudson, arrived at the park after the fight.  Thereafter, Carranza, Hernandez, and Hudson, along with another individual, left the park to go to Carranza's apartment.  Since Hernandez and Hudson were homeless, as was the third person, they were all going to spend the night at Carranza's apartment.  While they were watching movies, Carranza decided he wanted to buy more beer.  Hernandez gave Carranza some money, and Carranza left the apartment.

John Burleigh lived in the apartment adjacent to Carranza.  Around 10:00 p.m. he heard Carranza and Warren yelling at each other.  Carranza was in his apartment, while Warren was behind the apartment building.  It appeared Warren wanted to come into the apartment, but Carranza would not let him in.

Luther Sykes was on the side of a local liquor store drinking a beer when Carranza walked by.  Carranza, who had bought beer at the liquor store, stopped and asked Sykes if he wanted to have a beer with him at the park.  The two were talking when a third man approached.  Sykes was facing the man; Carranza had his back to the man.  The man, who Sykes could not identify, tapped Carranza on the shoulder.  When Carranza turned around, the man said, "Do you remember me?" and then struck Carranza in the face with his fist.  Carranza fell down and his head struck the concrete sidewalk.  The man walked back to the front of the liquor store, got into a vehicle, and drove away.[2]

---

[2]Security video from the liquor store helped identify Warren as the man who hit Carranza.

Madera Police Detective Josh Chavez testified to the statements made by Warren after his arrest. After being advised of his constitutional rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, Warren admitted he was in the park the day of the incident and had had a fight with Hernandez. He also admitted he went to Carranza's apartment later that night to speak with Hernandez but was told Hernandez was not available. Furthermore, Warren admitted he punched Carranza at the liquor store. Warren explained that while at the park earlier that day he had given Carranza $10 to buy methamphetamine. Carranza left, ostensibly to buy the methamphetamine, but did not return. Later that night as Warren was driving around town, he saw Carranza talking with Sykes. Warren parked his vehicle with the intent of obtaining "street justice." He went up to Carranza and hit him in the face for stealing his money. Warren then returned to his vehicle and left.

Dr. Mark Levy was working as a neurosurgeon at the hospital to which Carranza was transported. Carranza had a severe head injury that resulted in massive brain swelling. Medication was given and surgical intervention was performed to address Carranza's injuries, but those proved unsuccessful. Ultimately, Carranza's brain increased in size to such an extent that it died. The cause of the injury was an impact to the head. When Carranza initially arrived at the hospital, he was not in a coma. However, his condition quickly deteriorated, which caused Carranza to become comatose.

Dr. Jerry Nelson performed the autopsy on Carranza. He concluded the cause of death was a traumatic injury to the brain that occurred when Carranza fell and hit his head on the sidewalk. The rebound injury, or contrecoup injury, to the brain caused massive swelling that eventually shut down the blood flow to the brain, as well as damaged the brain stem.

Warren testified in his defense. He admitted he had had an altercation with Hernandez at the park earlier in the day. He also admitted he went by Carranza's

apartment, but stated he thought it was Hernandez's apartment. Warren testified he was looking for Hernandez but left when he learned Hernandez was not available. He then drove to the liquor store to buy some liquor and drug paraphernalia. After he parked he saw Carranza and Sykes drinking beer.[3] Warren decided to approach Carranza because Carranza had been hit in the head at the park earlier in the day and because he wanted his $10 back. Warren claimed he walked up to Carranza and said, "Remember me?" Sykes ran away when he saw Warren. Warren admitted he may have been "too close" to Carranza, and Carranza grabbed him by the coat when he turned around. Warren reacted by striking Carranza in the face with his elbow in self-defense. Carranza stumbled backwards but did not fall down immediately, eventually falling to the ground when his knee gave out.

The jury found Warren guilty as charged, and also found the enhancement true. The trial court sentenced Warren to the aggravated term of four years on the count charging Warren with assault with force likely to produce great bodily injury and then added five years for the coma enhancement, for a total term of nine years. The sentences on the remaining counts were imposed and stayed pursuant to section 654.

## DISCUSSION

Warren presents two arguments, both based on the same facts. Prior to trial, the trial court ruled that if Warren testified, he could be impeached with a 2010 conviction for making criminal threats (§ 422), which the court found to be a crime of moral turpitude. When Warren was called to the stand, defense counsel immediately asked him if he had a prior conviction for making criminal threats in 2010. Warren admitted the conviction. The prosecutor began her cross-examination by exploring the same topic.

> "Q First of all with regard to your threats conviction from 2010, that's a threat to kill somebody or harm them seriously, right?

---

[3]Warren claimed he did not know Carranza's name, but he admitted recognizing Carranza from the park.

"A     Actually it was a misdemeanor and I was told it was basically like—there's a school right next to me, kiddie college. They said it [was] kind of like disturbing the peace, that's my impression when I signed the plea deal.

"Q     You don't remember what it—it was terrorist threats, threatening to kill somebody?

"[DEFENSE COUNSEL]: Objection.

"THE COURT:     Overruled.

"THE WITNESS:     Yes, I wasn't informed at the time.

"[DEFENSE COUNSEL]: May we approach?

"THE WITNESS:     I [was] just told it was a misdemeanor.

"[DEFENSE COUNSEL]: Your Honor, I believe it misstates the evidence. I believe it misstates the terrorist threats.

"THE COURT:     It's been reclaimed. [¶]

"Q     It was criminal threats?

"A     Yeah. I told somebody I was going to get my rifle, yeah.

"Q     So you told somebody you were going to get a gun and harm them?

"A     Yeah, my son and it—he was tweaking on dope, stealing from me so it wasn't intended, it was just—I said it. And like I said, there was a college right next door so they called the police.

"Q     Your son was afraid?

"A     No, he wasn't afraid. I say that all the time.

"Q     So you threaten people all the time?

"A     No, just him.

"Q     You threaten your son all the time?

"A     It's not an intense—that kind of a manner but, yeah, he has got a serious drug problem."

6.

Two things are clear from this passage. First, most of the testimony about which Warren complains occurred because Warren did not limit his answer to the question asked by the prosecutor, but instead volunteered information that was not responsive to the question. Second, Warren was attempting to explain that he was not going to kill his son, but merely threatening him because of his son's behavior, which was related to his son's drug problem.

At the next break, defense counsel moved for a mistrial, asserting the facts of the underlying crime were prejudicial character evidence. Defense counsel did not ask the trial court to strike the testimony. The trial court denied the motion for mistrial.

In this appeal, Warren first argues the underlying facts of the crime were utilized by the prosecution as impermissible character evidence and therefore should have been excluded as more prejudicial than probative. Warren, however, did not seek to prevent introduction of the facts of the underlying crimes pursuant to Evidence Code section 352. Nor did defense counsel cite this section when objecting to Warren's testimony. More importantly, the prosecutor's questions did not seek to elicit the facts of the underlying crime; those facts were volunteered by Warren.

Warren's second argument is that the trial court erred in denying his motion for a mistrial. Since Warren essentially volunteered the evidence, there were no grounds for a mistrial. Accordingly, the trial court did not err in denying defense counsel's motion.

We need not rely on defense counsel's failure to object, or Warren's failure to limit his answers to the prosecution's questions, to affirm the judgment. Even if we were to assume the trial court erred, Warren cannot establish any prejudice. An error in the admission of evidence is reversible only if the error has resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; Evid. Code, § 353.) A miscarriage of justice occurs when, after an examination of the entire cause, including the evidence, it is reasonably probable that a result more favorable to the defendant would have been obtained had the

identified testimony been excluded.[4]  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)
Here, the alleged error did not adversely affect the outcome of the trial.  Hence, there was
not a miscarriage of justice.

We begin our analysis with Warren's testimony.  He claimed he was driving down
the street when he observed Carranza talking to Sykes outside the liquor store.  He
stopped his vehicle because he was concerned about Carranza's health.  Earlier in the day
Warren had testified that while he was in the park he had observed Carranza get hit in the
head by a golf club, an event no one else observed even though Carranza was well known
in the park.  Moreover, Warren's testimony strongly suggested Carranza was not injured
by this alleged incident since Warren saw Carranza in the park later that day and
observed Carranza depart with Hernandez and Hudson.  One would expect that if Warren
had been concerned about Carranza's health, an inquiry would have been made at that
time.

Warren next testified that he approached Carranza from behind to get his attention.
In an attempt to explain his claim of self-defense, Warren testified that perhaps he got a
little too close to Carranza before he tapped Carranza on the shoulder to get his attention.
Carranza was apparently startled by Warren's action because when Carranza turned
around he grabbed the front of Warren's jacket.  Warren then reacted by striking
Carranza in the face with his elbow.  Carranza then staggered about for a while before
falling to the ground.

---

[4]Warren attempts to cast his argument as one affecting his rights under the due
process clause of the United States Constitution, thus implicating the *Chapman  v.
California*  (1967) 386 U.S. 18, 24 test for reversal.  Under this case, when a federal
constitutional error has occurred, we cannot affirm the judgment unless we conclude the
error was harmless beyond a reasonable doubt.  While we fail to see any error, let alone
an error that resulted in a violation of Warren's constitutional right to due process, if such
an error occurred, we would also conclude the error was harmless under the *Chapman*
standard.

This sequence of events is contradicted by virtually every other piece of evidence. If Warren had thought Carranza might be injured, he would not have snuck up on Carranza and put himself in a position to startle Carranza or reacted violently when Carranza grabbed his jacket. Similarly, if Warren had been concerned about Carranza's health, one would expect Warren to have inquired about Carranza's health.

The video, according to the prosecutor's closing argument, which was not refuted by defense counsel, showed Warren arriving in his vehicle and then exiting the vehicle in an intentional and determined manner. The actual confrontation was not recorded because of the position of the camera. However, approximately 30 seconds later Warren again was observed running to his vehicle and driving off. Warren's demeanor and the short amount of time Warren was outside the view of the camera strongly suggest he had a specific purpose in mind when he approached Carranza, and he quickly accomplished that purpose.

Also inconsistent with Warren's testimony was the injury suffered by Carranza. Warren testified Carranza stumbled around for a moment before he fell. However, the extent of the injury sustained by Carranza strongly suggested Carranza had no time to react to protect himself when he fell.

The actual reason for the confrontation between Warren and Carranza can be found in Warren's statement to Chavez. Warren told Chavez the reason he stopped was because he had given Carranza $10 to buy methamphetamine, and Carranza had disappeared with his money. Warren explained he was merely seeking street justice, which is exactly what Warren did. This explanation is consistent with both the liquor store video and Carranza's injuries. Moreover, the independent evidence was consistent with Warren's confession and inconsistent with Warren's testimony. This evidence alone was overwhelming proof of Warren's guilt.

Sykes's eyewitness testimony provided additional proof that Warren fabricated his testimony. Sykes explained that Warren walked up to Carranza, tapped Carranza on the

9.

shoulder, "pulled his arm back," and hit Carranza in the face. Carranza then fell backwards and struck his head on the cement. Warren then left the liquor store, as was seen in the video. Sykes's testimony was consistent with the injuries suffered by Carranza.

We also note the testimony about which Warren complains was not nearly as prejudicial as he asserts. Warren explained that he confronted his son because his son had been stealing from him to support his methamphetamine habit. Warren threatened to shoot his son, but his son was not afraid and Warren never was going to shoot him. While this testimony may have been an example of Warren's lack of parenting skills, it was not so shocking that it would cause a jury to immediately disbelieve Warren's testimony or disregard all evidence supporting his claim of self-defense. Instead, it was the inherent improbability of Warren's testimony that caused the jury to reject it.

The evidence of Warren's guilt was conclusively established not only by Warren's confession but also by Sykes's testimony, the liquor store video, and the results of the autopsy. Accordingly, any possible error that occurred at trial was harmless beyond any possible doubt.

## DISPOSITION

The judgment is affirmed.